Filed 9/25/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| MARY L. SIMPSON, | B242405 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC475665) |
| v. | |
| THE KROGER CORPORATION, et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, BarbaraM. Scheper, Judge. Affirmed.

Morris Polich & Purdy, Jens B. Koepke and David J. Vendler for Plaintiff and Appellant.

Kelley Drye & Warren, Keri E. Campbell, Sarah L. Cronin, Kenneth D. Kronstadt, Sarah Roller and Donnelly McDowell for Defendants and Respondents.


_____


1

The issue in this case is whether products produced by defendant Challenge Dairy Products, Inc. and sold by defendant The Kroger Corporation in its supermarkets, which combine butter with canola oil or olive oil, are mislabeled under state and federal law. In her opening brief, plaintiff Mary L. Simpson claims the products are not "butter" and that they were mislabeled in violation of federal and state law by being labeled "spreadable butter with" either canola oil or a combination of canola and olive oil. In her reply brief, plaintiff changes her theory and asserts that her claim is that the additional oils are not identified with requisite prominence on the labels. Defendants argue that the California food labeling statutes under which plaintiff sues are preempted by federal food labeling standards. They contend that under controlling federal law, the products are properly labeled with their usual and common names, i.e., butter with canola oil or with olive and canola oil.

We conclude that the labeling requirements of the California Milk and Milk Products Act of 1947 (Food & Agr. Code, § 32501 et seq., (MMPA)) are not identical to the applicable federal labeling requirements and therefore plaintiff's claims under the MMPA are preempted; that plaintiff's mislabeling claims under the California Sherman Food, Drug and Cosmetic Law (Health & Saf. Code, § 109875 et seq. (Sherman Law)) are not preempted by federal law; and that the trial court did not abuse its discretion in denying leave to amend to allege claims based on violation of the Sherman Law because, as a matter of law, plaintiff has failed to demonstrate that a reasonable consumer would be misled by the labels on the products.

## FACTUAL AND PROCEDURAL SUMMARY

In October 2011, plaintiff purchased a tub of one of the relevant products at her local Ralphs supermarket.[1] She alleges that she purchased the product because she was already familiar with whipped butter products that are spreadable. Only when she got

---

[1] The first amended complaint alleges that The Kroger Corporation operates Ralphs supermarkets throughout California.

2

home did she realize "that the product she purchased was not in fact butter, but contained edible oils and other ingredients." The action concerns two Challenge butter products, but the complaint does not state which was purchased by plaintiff.

Challenge Spreadable Butter with Canola Oil is packaged in a tub. On the top panel of the tub the color backdrop depicts a mountain scene with a stag. At the top of this scene is a blue ribbon banner with white lettering with the words: "CHALLENGE BUTTER." To the left of the stag on a red ribbon banner in smaller yellow type are the words: "with DHA Omega-3 [¶] Supports Healthy Brain & Eyes." To the right of the of the stag there is a red oval with lettering in yellow type stating "Soft [¶] Even When [¶] Cold." Below the stag is a long yellow banner with the words "SPREADABLE BUTTER" in capital letters in blue type which is larger than the type in the red portions of the label. Centered at the bottom of this yellow banner is a blue banner with smaller white type stating "WITH CANOLA OIL." Underneath this statement, in white type of the same size is the word "SPREAD." The label on the side of the tub is the same except the word "SPREAD" is omitted. The label on the bottom panel of the tub lists the ingredients: "Pasteurized Cream (derived from milk). Canola Oil, Salt, Vitamin A Palmitate, Beta Carotene, DHA, Algal Oil."[2]

Challenge Tuscan Style Spreadable Butter is sold in a tub with similar labeling. The label on the top of the tub is a color backdrop depicting white buildings with red roofs against a rolling pastoral landscape. The label "CHALLENGE BUTTER" appears at the top of the landscape in white lettering on a red banner. Below and to the left is a blue ribbon banner stating in yellow type "with Olive Oil" in smaller print. Below that, on the blue ribbon, and in smaller white type appears "Garlic & Italian Herbs." In the center bottom of the top label in red lettering on a gold banner are the words "TUSCAN STYLE" in larger type. Immediately below is a blue banner with smaller white lettering stating: "SPREADABLE BUTTER *with* CANOLA & OLIVE OIL." Centered below

---

[2] Copies of the top, side, and bottom labels of Challenge Spreadable Butter with Canola Oil are attached to this opinion as appendices A, B, and C, respectively, *post*, pages 20–22.

that statement is the word "SPREAD" in the same size type. The side panel is the same, but the word "SPREAD" is omitted. The bottom panel on the tub lists the ingredients: "Pasteurized cream (derived from milk), canola oil, olive oil, roasted garlic puree, natural flavors, garlic puree, dried garlic, spices, sea salt, vitamin A palmitate, beta carotene."[3]

The operative pleading in this case is the first amended complaint, a putative class action alleging causes of action for unfair competition (Bus. & Prof. Code, § 17200 et seq.), false advertising (Bus. & Prof. Code, § 17500 et seq.), and violation of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.). Plaintiff sought damages, a permanent injunction prohibiting the sale of margarine, spread, or dairy spread if not in compliance with the provisions of the MMPA, costs and fees.

Defendants jointly demurred to the complaint on the ground that the products were properly labeled under the MMPA. They also argued the MMPA is expressly and impliedly preempted by the federal Food Drug and Cosmetic Act (FDCA) (21U.S.C. § 301 et seq.).[4] In opposition, plaintiff argued that the products are a "spread" rather than "butter" under the definitions of the MMPA. In arguing that her claims under the MMPA are not preempted by the FDCA, plaintiff cited a provision of the Sherman Law which incorporates Federal Drug Administration (FDA) regulations regarding the branding of food (Health & Saf. Code, § 110100, subd. (a)). But she did not seek leave to amend to allege a cause of action under the Sherman Law.

The trial court agreed with defendants, finding that plaintiff's California claims were preempted. The court found that the products are nonstandardized butter, for which there is a federal labeling requirement, but no comparable California labeling requirement. The court denied leave to amend because an amendment could not address the legal issues on which its ruling was based. The action was dismissed with prejudice.

---

[3] Copies of the top, side, and bottom labels of Challenge Tuscan Style Spreadable Butter with Canola Oil & Olive Oil are attached to this opinion as appendices D, E, and F, respectively, *post*, pages 23–25.

[4] All further unlabeled statutory references are to Title 21 of the United States Code.

4

An order of dismissal with prejudice was entered. Plaintiff appeals from the order of dismissal. "We apply a de novo standard of review because this case was resolved on demurrer [citation] and because federal preemption presents a pure question of law [citation]." (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.)

## DISCUSSION

### I

The labeling of food products is heavily regulated by both federal and state law. The gravamen of the first amended complaint is that the labels on the products at issue violate the MMPA. On appeal, the thrust of plaintiff's argument shifted. Her primary argument became that she should have been granted leave to amend to allege the labels violated the Sherman Law, rather than the MMPA, a claim which she argues is not preempted. She also argues that her MMPA claims are not preempted. We address both the MMPA and the Sherman Law as a basis for plaintiff's claims.

Under both the FDCA and the Sherman Law, foods fall into two broad groups: those for which a definition and standard of identity has been created by federal regulation, and those not defined by federal regulation. Under the FDCA, regulations may be promulgated "fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity. . . ." (21 U.S.C. § 341.) Butter is expressly excepted from this: "No definition and standard of identity and no standard of quality shall be established for . . . butter . . . ."[5] (21 U.S.C. § 341.)

We refer to the first group as "standardized foods" and the second as "nonstandardized foods." The parties disagree as to whether the food products at issue

---

[5] See also 58 Federal Register 2449-52 (Jan. 6, 1993), in which the FDA recognizes that it does not have the authority to establish a definition and standard of identity for light butter in light of section 341.

here are standardized or nonstandardized foods. As we discuss, this categorization of foods impacts the preemption analysis.

A. *FDCA*

"The FDCA prohibits the misbranding of any food. (§ 331(b).) A food 'shall be deemed to be misbranded' under the FDCA if 'its labeling is false or misleading in any particular . . . .' (§ 343(a).)" (*Farm Raised Salmon Cases, supra,* 42 Cal.4th at p. 1085.) In 1990 the FDCA was amended by the Nutrition Labeling and Education Act of 1990 (NLEA) with the purpose of "creat[ing] uniform national standards regarding the labeling of food and to prevent states from adopting inconsistent requirements with respect to the labeling of nutrients. [Citation.]" (*Id.* at pp. 1085–1086.) "To that end, the NLEA included an explicit preemption provision in the form of section 343-1(a) [citation], which provides that 'no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce—[¶] . . . [¶] (3) any requirement for the labeling of food of the type required by section . . . 343(k) of this title *that is not identical to the requirement* of such section . . . .' (§ 343-1(a), italics added.)"[6] (*Id.* at p. 1086.)

There is no private right of action under the FDCA. (*Merrell Dow Pharmaceuticals, Inc. v. Thompson* (1986) 478 U.S. 804, 810–811.) Under section 343-1, states may establish their own requirements so long as they are identical to those in the FDCA. (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1086, [quoting 60 Fed.Reg. 57120 (Nov. 13, 1995) "under FDA regulations, 'if the State requirement is identical to Federal law, there is no issue of preemption'"].)

The FDCA defines "butter" to mean "the food product usually known as butter, and which is made exclusively from milk or cream, or both, with or without common salt,

---

[6] The Supreme Court recognized that "FDA regulations make clear that the phrase 'not identical to' in section 343-1(a)(3) 'does not refer to the specific words in the requirement.' (21 C.F.R. § 100.1(c)(4) (2007).)" (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1086, fn. 8.) Even if the words used in the state requirement are not exactly the same, the requirement is effectively the same so long as the state requirement does "the same thing that the Federal law does." (*Ibid.*)

and with or without additional coloring matter, and containing not less than 80 percentum by weight of milk fat, all tolerances having been allowed for." (§ 321a.) "Cream" is defined in the Code of Federal Regulations as "the liquid milk product high in fat separated from milk, which may have been adjusted by adding thereto: Milk, concentrated milk, dry whole milk, skim milk, concentrated skim milk, or nonfat dry milk. Cream contains not less than 18 percent milkfat." (21C.F.R. § 131.3(a).) Specific definitions and standards of identity have been adopted for other milk and cream products, such as sour cream, half-and-half, and yogurt. (21 C.F.R. §§ 131.110–131.206.) There is no specific federal definition or standard of identity for butter combined with canola or olive oil.

Section 347 of the FDCA governs labeling of margarine. The definition of margarine for purposes of section 347 is stated in Title 15 United States Code section 55(f)(2) as including: "all substances, mixtures, and compounds which have a consistence similar to that of butter and which contain any edible oils or fats *other than milk fat* if made in imitation or semblance of butter." (Italics added.) Margarine is a standardized product under FDA regulations, defined as food in plastic form or emulsion, containing not less than 80 percent fat produced from a number of specified optional agreements, which include edible fats and oils, milk or milk products, and flavoring substances. (21 C.F.R. § 166.110.) Any flavoring substance which imparts a flavor "other than in semblance of butter" must be declared as part of the name of the food. (21 C.F.R. § 166.110(b)(7).) Each ingredient used in margarine must be declared on the label. (21 C.F.R. § 166.110(d).)

Section 343(i) regulates labeling of nonstandardized foods. It requires the label to bear the common or usual name of the food, and if two or more ingredients are included, the common or usual name of each food except spices and flavorings must be on the label.

B. *MMPA*

The MMPA defines "butter" as "the product made by gathering the fat of fresh or ripened milk or cream into a mass, which also contains a small portion of other milk

7

constituents."[7]  (Food & Agr. Code, § 37161.)  Cream is defined as "that portion of milk, rich in milk fat, which rises to the surface of milk that is left standing or which is separated from milk by centrifugal force."  (Food & Agr. Code, § 32504.)  Section 37164 of the MMPA defines "flavored butter":  "Butter flavored with spices, condiments, garlic, chives, herbs, or other flavoring may be sold in whipped or solid form, provided the product meets the following requirements:  [¶] (a) The butter, before flavoring, meets all of the requirements for USDA 93 score (AA Grade) butter.  [¶] (b) *The principal flavor is identified on the container with equal prominence with the word 'butter.'*  [¶] (c) *The principal display panel has a list of all ingredients in the descending order of predominance, and identifies the name and address of the manufacturer.*  [¶] (d) The product is processed in a licensed milk products plant.  [¶] (e) The product contains no preservative."  (Food & Agr. Code, § 37164, italics added.)

"'Milk product' or 'dairy product' means any product which is prepared or manufactured from milk, for which product a standard of composition is established by this division, and any new milk product or combination milk and food product for which a temporary standard of composition is established pursuant to Chapter 1 (commencing with Section 36601) of Part 3.  'Milk product' or 'dairy product' does not include 'products resembling milk products' as defined in Section 38912."[8]  (Food & Agr. Code, § 32512.)  "'Nondairy product' means a product resembling a milk product, but which nondairy product contains no milk or milk solids."  (Food & Agr. Code, § 38915.)

The MMPA also defines "margarine," "dairy spread," and "spread."  Plaintiff makes no argument that the products here constitute either "margarine" or "dairy spread" contending only that they are a "spread" under the MMPA.

---

[7] Butter may contain salt or a harmless coloring matter.  (Food & Agr. Code, § 37163.)

[8] Food and Agricultural Code section 38912 defines "'products resembling milk products'" as "any food product . . . which has the appearance, taste, smell, texture or color of a milk product and which, taken as a whole, bears resemblance to a milk product, could be mistaken for a milk product, or could be used as a substitute for a milk product."

"Spread" is defined as "a substitute for butter consisting of mixtures of compounds which may include milk solids-not-fat and edible oils and fats that is made in imitation or semblance of butter and does not meet the definition for margarine or dairy spread." (Food & Agr. Code, § 39521.) In opposition to defendants' demurrer, plaintiff noted that defendants had conceded that their products did not fit the definitions for margarine or dairy spread.

Under the MMPA, "[i]t is unlawful for any person to sell any margarine, dairy spread, or spread, unless there is printed upon the label of each and every package, or other container . . . all of the following: [¶] (a) The words 'oleomargarine,' 'margarine,' 'dairy spread,' or 'spread,' as the case may be *in letters which are at least as large as any other type or lettering on the label*. The word 'oleomargarine,' 'margarine,' 'dairy spread,' or 'spread,' shall be of a color in strong contrast to the color of the container. [¶] . . . [¶] (d) A full and accurate statement of all the ingredients which are contained in the substance in the package." (Food & Agr. Code, §§ 39411, 39382, italics added.) Margarine, dairy spread, or spread may not be sold under the name of butter, under the pretense that it is butter, or that it is a dairy product. (Food & Agr. Code, §§ 39431, 39432.)

C. *Sherman Law*

"Like the FDCA, the Sherman Law broadly prohibits the misbranding of food," which is defined as labeling that is false or misleading in any particular. (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1086; see also Health & Saf. Code, §§ 110660, 110765.) "[T]he Sherman Law incorporates '[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the [FDCA]' as 'the food labeling regulations of this state.' (Health & Saf. Code, § 110100, subd. (a).)" (*Id*. at p. 1087.)

Under the Sherman Law, a food is misbranded "if it is offered for sale under the name of another food, or if it is an imitation of another food for which a definition and standard of identity has been established by regulation and its label does not bear, in type of uniform size and prominence the word 'imitation,' and immediately following, the name of the food imitated." (Health & Saf. Code, § 110685.) A food also is misbranded

9

"if it purports to be, or is represented as, a food for which a definition and standard of identity has been established under Section 110505 and the label fails to bear the name of the food specified in the standard or otherwise fails to conform to the definition and standard." (Health & Saf. Code, § 110710.) "Any food for which no standard of identity exists is misbranded unless it bears a label clearly stating the common or usual name of the food." (Health & Saf. Code, § 110720.)

"Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto." (Health & Saf. Code, § 110670.) "Any food is misbranded if any word, statement, or other information required pursuant to this part to appear on the label or labeling is not prominently placed upon the label or labeling with conspicuousness, as compared with other words, statements, designs, or devices in the labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use. (Health & Saf. Code, § 110705.)

II

Preemption is an issue in this case principally because of the express preemption provision added to the FDCA in 1990 by adoption of the NLEA. Section 343-1(a) provides: "Except as provided in subsection (b) [of this section], no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce—[¶] (1) any requirement for a food which is the subject of a standard of identity established under section [341 of this title] *that is not identical to such standard of identity* or that is not identical to the requirement of section [343(q) of this title]. . . ." (Italics added.) Section 343-1(a)(2) applies to "any requirement for the labeling of food of the type required by section . . . [343(i)(2)] . . . that is not identical to the requirement of such section . . . ." Similarly, section 343-1(a)(3) applies to any requirement for labeling of food of the type required by section 343(i)(1) that is not identical to the requirement of that section.

Section 343(i) sets the requirements for labeling of foods where there is no representation that a definition and standard of identity has been created for that food, i.e., nonstandardized foods as we have defined them. It requires that a nonstandardized food have a label bearing "(1) the common or usual name of the food, if any there be, and (2) in case it is fabricated from two or more ingredients, the common or usual name of each such ingredient . . . except that spices, flavorings, and colors not required to be certified under section [379e(c) of this title] . . . may be designated as spices, flavorings, and colorings without naming each. . . ." (§ 343(i).)

The impact of section 343-1(a)(2), read with section 343(i), is that the express preemption clause of the FDCA applies to labeling of nonstandardized food products. In addition, section 343-1(a)(3) extends express preemption to any food "offered for sale under the name of another food." (See § 343(b).)

The California Supreme Court addressed whether section 343-1 preempted California laws regulating the labeling of farm raised salmon fed food containing artificial color additives in *Farm Raised Salmon Cases*, *supra*, 42 Cal.4th 1077. FDA regulations allowed the use of color additives in salmon feed, but required that it be declared in labeling. (*Id*. at p. 1085.) The court first concluded that the Sherman Law labeling requirements were identical to those in section 343(k) of the FDCA, which addresses the labeling of foods containing artificial coloring. The Sherman Law used language identical to section 343(k) to require disclosure of the additives in labels. The Supreme Court also relied on the Sherman Law's express incorporation of all food labeling regulations of the FDCA as "'the food labeling regulations of this state.' (Health & Saf. Code, § 110100, subd. (a).)" (*Farm Raised Salmon Cases,* at pp. 1086–1087.)

The party who claims preemption has the burden of demonstrating that it applies. (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1088.) The analysis of a preemption question must take into account the strong presumption against preemption. (*Ibid.*) The presumption applies to the existence as well as the scope of preemption. (*Ibid.*) The court in *Farm Raised Salmon Cases* concluded that this presumption applied with particular force in that case because laws regulating the proper marketing of food,

11

including the prevention of deceptive sales practices, are within the states' historic police powers.  (*Ibid.*)

In *Farm Raised Salmon Cases*, the defendants asserted only that the plaintiffs' claims were impliedly preempted because they created an obstacle to the accomplishment and execution of the full purposes and objective of Congress in enacting the FDCA.  (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1089.)  Unlike the case before us, there was no claim of express preemption because the state and federal requirements were identical.  The Supreme Court held that Congress had not "expressly preempted private claims predicated on *state laws* imposing requirements identical to those contained in the FDCA . . . ."  (*Ibid.*)  The court concluded:  "Accordingly, the state requirements at issue here are explicitly permitted by section 343-1.  (See *Consumer Justice* [*Center v. Olympian Labs, Inc.* (2002)] 99 Cal.App.4th [1056,] 1065 ['[s]tates *can* enforce labeling rules which *are* identical. . . . ' (original italics)].)"  (*Id.* at p. 1090.)  The Supreme Court said that while Congress clearly intended to allow states to establish their own identical laws, it said nothing about limiting the range of available remedies states might provide for violation of those laws, such as private actions.  (*Ibid.*)  It found nothing in the legislative history suggesting a sweeping preemption of private actions predicated on requirements contained in state laws.  (*Ibid.*)

The court in *Farm Raised Salmon Cases* found support in an uncodified provision of NLEA (section 6(c)(1)):  "Further undermining defendants' interpretation is the fact that Congress made clear that the preemptive scope of section 343-1 was to sweep no further than the plain language of the statute itself.  In NLEA section 6(c)(1) (an uncodified provision), Congress provided that '[t]he NLEA shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under [section 343-1] of the [FDCA].'  (Pub.L. No. 101-535, § 6(c)(1) (Nov. 8, 1990), 104 Stat. 2364.)"  (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1091.)  The court found that this uncodified provision signified an intent to allow state and federal regulation to coexist.  "'Where Congress establishes a regime of dual state-federal regulation, "conflict-pre-emption analysis must be applied sensitively . . . so as to prevent the

12

diminution of the role Congress reserved to the States while at the same time preserving the federal role." [Citations.]' (*Viva! International* [*Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007)] 41 Cal.4th [929,] 942.)" (*Id.* at pp. 1091–1092, fn. omitted.)  The court also found the uncodified provision significant "because it informs our analysis of the existence of any implied preemption:  "'[A]n express definition of the pre-emptive reach of a statute "implies"—*i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters . . . . [Citation.]" (*Id.* at p. 1092.)  It concluded that "deference should be paid to Congress's detailed attempt to clearly define the scope of preemption under the FDCA.  [Citation.]" (*Ibid.*)

The Supreme Court recognized that "Congress enacted numerous specific express preemption provisions in the FDCA.  [Citation.]" (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1092.)  It concluded that in combination with section 343-1, these provisions demonstrated "Congress's care in deciding what to preempt and what to allow. Section 343-1 is notable both for the number of misbranding provisions it deals with (approximately 20) and for the detailed nature of its preemptive scope.  The language of section 343-1 and the NLEA's express preemption provision is further evidence that Congress chose carefully the manner with which it preempted certain state labeling laws." (*Farm Raised Salmon Cases,* at p. 1092, fn. omitted.)

In *Farm Raised Salmon Cases*, *supra*, 42 Cal.4th 1077, the Supreme Court concluded "that Congress intended to allow states to establish their own requirements *so long as they are identical to those contained in* section [343 of the FDCA] . . . ." (*Id.* at p. 1094, italics added.)  It also concluded that Congress did not intend to limit the scope of state remedies for violations of state laws identical to the FDCA. (*Id.* at p. 1095.)  The preemption issue, therefore, turns on whether the labeling requirements of California law are identical to those of the FDCA.

III

The cornerstone of plaintiff's argument is that the trial court should have allowed her leave to amend to allege violations of the Sherman Law labeling requirements because they are identical to those under section 343-1 of the FDCA and are therefore not

13

preempted. She contends that she should be allowed to raise this issue even though it was not "the focus" of her complaint or her demurrer opposition. We may consider new theories on appeal from the sustaining of a demurrer.[9] (*Kruss v. Booth* (2010) 185 Cal.App.4th 699, 712, fn. 13, citing Code Civ. Proc., § 472c, subd. (a), italics omitted ["'When any court makes an order sustaining a demurrer without leave to amend the question [as to] whether or not such court abused its discretion in making such an order is open on appeal even though no request to amend such pleading was made.'"].)

A. *Sherman Law Claims*

Plaintiff argues that a misbranding claim based on Health and Safety Code section 110660 (part of the Sherman Law) cannot be preempted because it is identical to section 343(a) of the FDCA, which is not included under the preemption provision of section 343-1 of the FDCA. Section 343(a) provides that food shall be misbranded if "its labeling is false or misleading in any particular . . . ." Plaintiff cites Health and Safety Code section 110660, a similarly broad misbranding statute which defines misbranding as false or misleading labeling in any particular. Plaintiff claims that the labels on these products were misleading or false "because the representation suggested by the combination of words and statements on the label is that the product is butter, when in fact it is not."

While it is true that the federal and state statutes cited by plaintiff are identical, the argument is too simplistic. It ignores the specific preemption provisions of section 343-1 which we have cited. Plaintiff cites *Chavez v. Blue Sky Natural Bev. Co.* (N.D. Cal. 2010) 268 F.R.D. 365, as a case in which the court held that a plaintiff's claims under California statutes based on mislabeling were not preempted by the FDCA. In *Chavez*, the key was that the plaintiff's claims did not fall within the express preemption provisions of section 343-1. (*Id.* at p. 372.) Therefore, its analysis is relevant here only if none of plaintiff's claims come within the express preemption provisions of the FDCA.

---

[9] In light of this rule, we need not determine whether plaintiff's brief references to the Sherman Law in opposition to the demurrer and at the hearing on the demurrer were sufficient to raise the Sherman Law claim.

Alternatively, plaintiff claims that her Sherman Law claims come within the misbranding provisions of section 343 of the FDCA are not preempted because they are identical to the federal law. She relies on the following parallel provisions of the Sherman Law and the FDCA declaring food misbranded: 1) if a food is offered for sale under the name of another food (§ 343(b); Health & Saf. Code, § 110685); 2) required information is not conspicuously placed on a label (§ 343(f); Health & Saf. Code, § 110705); and 3) a food is labeled so it purports to be a food for which a definition and standard of identity has been established, unless it conforms to the definition and standard and the name of that food is on the label (§ 343(g); Health & Saf. Code, § 110710).

State laws identical to these provisions of the FDCA are exempted from preemption under section 343-1. Therefore, plaintiff contends, since the Sherman Law provisions upon which she relies are identical to provisions of the FDCA, they are not preempted under the rationale of the court in *Farm Raised Salmon Cases*, *supra*, 42 Cal.4th 1077. We agree with plaintiff that her Sherman Law claims are identical to provisions of the FDCA and are not preempted under the reasoning of the court in *Farm Raised Salmon Cases*. As the Supreme Court recognized, the Sherman Law expressly incorporates the requirements of the FDCA. (Health & Saf. Code, § 110660.)

B. *MMPA*

In her reply brief, plaintiff claims her MMPA claims are not preempted, "because the broad federal definition of 'margarine' is *substantially identical* to the state definition of 'spread,' and both state and federal law have the identical prominent labeling and misbranding requirements for this kind of butter substitute." (Italics added.) Although plaintiff continues to disclaim any argument that these products should be labeled as margarine, she inconsistently argues that the MMPA claim is not preempted because the federal requirements for labeling margarine in Title 21 United States Code section 347(b)(3) and in the accompanying regulation, 21 Code of Federal Regulations part 166.40(c) are identical to the MMPA requirement for labeling "spread" (Food & Agr. Code, § 39411, subd. (a)). FDCA section 347(b)(3) requires that margarine be labeled with "(A) the word 'oleomargarine' or 'margarine' in type or lettering at least as large as

15

any other type or lettering on such label, and (B) a full and accurate statement of all the ingredients contained in such oleomargarine or margarine . . . ." The regulation sets out requirements for the height of each letter, the area of a closely fitting rectangle drawn around the word "margarine," and the prominence and boldness of the letters, such as the breadth of lines forming the letters. (21 C.F.R. §166.40(c)(3).)

In contrast, Food and Agricultural Code section 39411 of the MMPA requires the words "margarine" to be in type at least as large as any other type or lettering on the label in "a color in strong contrast to the color of the container." (Food & Agr. Code, § 39411, subd. (a).) It also requires the label to include the name and address of the manufacturer or distributor, the net weight, and all ingredients. (Food & Agr. Code, § 39411, subds. (b)-(d).) These provisions are not identical, despite plaintiff's efforts to characterize them as such. Nothing in the preemption provision of the FDCA, or in the rationale of the Supreme Court in *Farm Raised Salmon Cases*, extends the exemption from preemption to state laws which are "substantially identical" rather than identical as plaintiff asserts. We conclude that plaintiff's MMPA claims are preempted under section 343-1 of the FDCA. In light of our conclusion that the MMPA claims are expressly preempted, we need not discuss defendants' alternative implied preemption argument.

IV

Defendants argue that spreadable butter with oil products are nonstandardized products under the FDCA and must be labeled in accordance with their common and usual name under the implementing regulations. They contend there is no basis for the three consumer causes of action alleged by plaintiff because the products were not mislabeled or misbranded. The basic rule under the regulations is that "[t]he common or usual name of a food, which may be a coined term, shall accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." (21 C.F.R. § 102.5(a).) Subdivision (c) of this regulation provides that "[t]he common or usual name of a food shall include a statement of the presence or absence of any characterizing ingredient(s) or component(s) . . . when the presence or absence of such ingredient(s) or component(s) in the food has a material

16

bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present when it is not, and consumers may otherwise be mislead about the presence or absence of the ingredient(s) or component(s) in the food." (21 C.F.R. § 102.5(c).) Defendants argue the labels here comply with these requirements because they clearly state that the product is spreadable butter containing both butter and an additional oil, either canola oil, or olive oil in combination with canola oil.

Plaintiff's response was to change her theory of the case yet again. Plaintiff now disclaims any argument that the word "butter" cannot appear on the labels of the products. Instead, she contends her "claim is rooted in improper prominence: That the over-prominence of the word 'butter' on this label for this non-standardized butter product is misleading, because it leads consumers to believe that this product is actually standard butter, which Challenge concedes it is not. In other words, because the words 'CHALLENGE BUTTER' AND 'SPREADABLE BUTTER' are so much larger and more conspicuous than the other identifiers, 'With Canola Oil' and 'Spread,' it confuses and misleads the consumer into thinking this is standard butter."

Raising a new theory in a reply brief is improper and unfair to defendants. We may decline to consider an argument raised for the first time in a reply brief if no good reason is demonstrated for the delay in raising the point. (*Proctor v. Vishay Intertechnology, Inc.* (2013) 213 Cal.App.4th 1258, 1273–1274.) Even if we were to address plaintiff's new theory, we would reach the same result because we conclude that plaintiff has not, and as a matter of law cannot, allege that a reasonable consumer would have been mislead by the labels here.

In *Yumul v. Smart Balance, Inc.* (C.D. Cal. 2010) 733 F.Supp.2d 1117 (*Yumul*), plaintiff brought a putative class action alleging purchase of Nucoa margarine, manufactured by Smart Balance, which is labeled "cholesterol free" although it allegedly contained harmful trans fat. She alleged that the label was misleading on this ground. The complaint alleged causes of action for violations of the California Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.), False Advertising Law (Bus. &

17

Prof. Code, § 17500 et seq.), and Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.). (*Yumul*, at p. 1120.) The court considered whether the complaint should be dismissed with prejudice because the packaging was not misleading. Although California "courts have held that reasonable reliance is not an element of the claims under [the three statutory schemes alleged]," a plaintiff must establish that consumers were likely to be deceived by the product. (*Id*. at p. 1125; *In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116, 130 [to state a claim for deceptive advertising under the Consumer Legal Remedies Act, a plaintiff "need only establish that members of the public were likely to be deceived by the advertising."]; *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 682 [to establish a false advertising claim, "a plaintiff need only show that members of the public are likely to be deceived" under a "'reasonable consumer' standard"].)

The *Yumul* court observed that under California law, in appropriate circumstances, reasonableness can be decided as a question of law, but "usually will be a question of fact not appropriate for decision on [a motion to dismiss]. [Citations.]" (*Yumul*, *supra*, 733 F.Supp.2d at pp. 1125–1126.) This principle was recognized in *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 333, in which the court acknowledged that in some circumstances, a court may be able to "say as a matter of law that contrary to the complaint's allegations, members of the public were *not* likely to be deceived or misled by . . . packaging materials." In *Freeman v. Time, Inc.* (9th Cir. 1995) 68 F.3d 285, the district court had dismissed a cause of action under California Business and Professions Code section 17200 for failure to state a claim based on two mailers for a promotion announcing a "'Million Dollar Dream Sweepstakes.'" (*Id*. at p. 287.) The mailers were couched in language suggesting that plaintiff had won the sweepstakes, but only if he returned the winning prize number. (*Ibid.*) Based on an examination of the mailers, the Ninth Circuit determined that no reasonable person could believe they had won the sweepstakes in light of the qualifying language included in the mailer. (*Id*. at pp. 289–290.) The court concluded that the plaintiff failed to allege a violation of Business and Professions Code section 17200 on this basis and affirmed dismissal of such claims. (*Id*. at p. 290.)

18

Our case is similar.  The labels on the products here clearly informed any reasonable consumer that the products contain both butter and canola or olive oil.  This was plain on both the top and side panels of the tubs in which the products are sold.  No reasonable person could purchase these products believing that they had purchased a product containing only butter.  The trial court did not abuse its discretion in denying leave to amend.

## DISPOSITION

The order of dismissal is affirmed.  Defendants are to have their costs on appeal.

**CERTIFIED FOR PUBLICATON**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

SUZUKAWA, J.

19



# APPENDIX A

20



# APPENDIX B



**Nutrition Facts**

Serving Size 1 Tbsp. (14g)
Servings Per Container: about 30

**Amount/Serving**

| | |
|---|---|
| Calories 90 | Calories from Fat 90 |

**% Daily Value\***

| | |
|---|---|
| **Total Fat** 10g | 15% |
| Saturated Fat 3.5g | 18% |
| Trans Fat 0g | |
| Polyunsaturated Fat 2g | |
| Monounsaturated Fat 4g | |
| **Cholesterol** 10mg | 3% |
| **Sodium** 70mg | 4% |
| **Total Carbohydrate** 0g | 0% |
| **Protein** 0g | |
| Vitamin A 8% | |

\*Percent Daily Values are based on a 2,000 calorie diet

QUESTIONS?
Call toll free at 1-877-863-2479
or visit www.challengedairy.com

Ingredients: Pasteurized Cream (derived from milk), Canola Oil, Salt, Vitamin A Palmitate, Beta Carotene, DHA, Algal Oil.

Distributed by Challenge Dairy Products, Inc. Dublin, CA 94568
© Copyright Challenge Dairy Products, Inc. 1925

lifesDHA
life'sDHA is a trademark of Martek Biosciences Corporation

0 47200 15259 7

# APPENDIX C



# APPENDIX D



# APPENDIX E



**Nutrition Facts**
Serving Size 1 Tablespoon (14g)
Servings Per Container about 14

**Amount Per Serving**

**Calories** 90    Calories from Fat 90

%Daily Value*

| | |
|---|---|
| **Total Fat** 10g | **15%** |
| Saturated Fat 6g | **30%** |
| Trans Fat 0g | |
| **Cholesterol** 15mg | **5%** |
| **Sodium** 70mg | **3%** |
| **Total Carb.** 0g | **0%** |
| Dietary Fiber 0g | **0%** |
| Sugars 0g | |
| **Protein** 0g | |

Vitamin A 8%   •   Vitamin C 0%

*Percent Daily Values are based on a 2,000 calorie diet.

QUESTIONS?
Call Toll Free at 1-877-883-2479
or Visit www.challengedairy.com

Ingredients: Pasteurized cream (derived from milk), canola oil, olive oil, roasted garlic puree, natural flavors, garlic puree, dried garlic, spices, sea salt, vitamin A palmitate, beta carotene. Allergen: Manufactured on equipment that processes products containing tree nuts.

Distributed by Challenge Dairy Products, Inc. Dublin, CA 94568
©Copyright Challenge Dairy Products, Inc 1925

# APPENDIX F